## UNITED STATES v. AMERICAN OPTICAL CO. et al.

United States District Court
S. D. New York.
Nov. 14, 1950.

772

See, also, D.C., 7 F.R.D. 158.

Root, Ballantine, Harlan, Bushby & Palmer, New York City, John E. F. Wood, New York City, Hector M. Holmes, Boston, Mass., and James P. Kranz, Jr., New York City, for American Optical Co.

Theodore E. Simonton, New York City, for Shuron Optical Co., Inc.

BONDY, District Judge.

This is an application for the determination of a reasonable royalty for a non-exclusive, non-assignable license to make, use and vend semi-rimless spectacle mountings under United States Letters Patent Reissue No. 21,255 (hereinafter called the Gagnon patent). The application is made by American Optical Company (hereinafter called American), owner of the Gagnon patent, at the request of Shuron Optical Company, Inc. (hereinafter called Shuron), applicant for a license under that patent, pursuant to provisions of the final judgment entered September 17, 1948, on consent, in this civil anti-trust action. The judgment cancelled a number of patent licenses and agreements and ordered compulsory licensing of numerous patents, including the Gagnon patent, on a uniform and reasonable royalty basis.

Article VI(D) of the judgment provides: "Upon application for a license under the provisions of this Section, the defendant to whom application is made shall state the royalty which it deems reasonable for the patents to which the application pertains. If the parties are unable to agree upon a reasonable royalty, the defendant may apply to this Court for the determination of a reasonable royalty, giving notice thereof to the applicant and the Attorney General, and he shall make such application forthwith upon request of the applicant. In any such proceeding, the burden of proof shall be upon the defendant to whom application is made to establish by a fair preponderance of evidence, a reasonable royalty, and the Attorney General shall have the right to be heard thereon * * *."

Upon the application of Shuron for a license under the Gagnon patent, American proposed a royalty of 4¢ for each mounting covered thereby. This rate not being acceptable to Shuron, it called upon American to apply to the court for the determination of a reasonable royalty. American thereupon instituted this proceeding. The Attorney General, having been notified, stated that the government did not wish to take any position with respect to the royalty controversy between American and Shuron.

American contends that 4¢ per mounting has become the "established" royalty for a license under the Gagnon patent because it has been "paid by such a number of persons as to indicate a general acquiescence in its reasonableness by those who had occasion to use the invention." Rude v. Westcott, 130 U.S. 152, 165, 9 S.Ct. 463, 468, 32 L.Ed. 888. Whether established or not, however, American further contends that 4¢, representing 1.4 per cent. of the selling price of the mounting to wholesale distributors ($2.85), is a reasonable royalty. Shuron denies that any royalty has been established for a license under the Gagnon patent and asserts that a reasonable royalty for such a license is zero.

Shuron has conceded for purposes of this proceeding that the Gagnon patent is valid and covers "Numont" mountings manufactured by it. Its claim that the patent is worthless is predicated on its contention that Gagnon's invention did not make any contribution whatever to the practical spectacle art but was "of the most trifling

character * * * the shadow of a shade." Columbia Machine & S. Corp. v. Adriance Machine Works, 2 Cir., 79 F.2d 16, 18. See also U. S. v. National Lead Co., 332 U.S. 319, 349, 67 S.Ct. 1634, 91 L.Ed. 2077. It is agreed, however, that evidence as to the scope and nature of the Gagnon patent becomes a relevant consideration only in the event that there is not any established royalty for a license under the patent.

Shortly after the consent judgment cancelled all outstanding licenses under the Gagnon patent (other than a paid-up license issued some years before to the Bausch & Lomb Optical Company), nine of fifteen potential Gagnon licensees accepted the royalty rate of 4¢ proposed by American, and received licenses. When it became known that Shuron intended to cause the initiation of the present proceeding, the other prospective licensees suspended negotiations for licenses pending the result of the proceeding.

Owing to the reluctance of the members of the optical industry to divulge their sales figures, the court has not been informed as to the amount of sales of semi-rimless spectacle mountings by each optical manufacturer. Counsel, however, have stipulated that the nine companies which have executed Gagnon licenses since the consent judgment accounted for slightly less than 25 per cent. of the total volume of sales of semi-rimless mountings in 1947; that sales of such mountings by the companies, including Shuron, which have not executed licenses constituted slightly more than 25 per cent. of the total; and that sales by American and Bausch & Lomb together constituted approximately 50 per cent. of the total. It has further been stipulated that the largest sellers of semi-rimless mountings in 1947 were American, Shuron and Bausch & Lomb, in that order, and that the nine licensees ranked, 4th, 5th, 6th, 7th, 9th, 11th, 12th, 15th and 16th in relative volume of semi-rimless sales in that year.

American urges that the nine licensees, comprising 60 per cent. of those who had occasion to consider taking a license under the patent, represent a fair cross section of the industry and are a sufficient number

to show general acquiescence in the reasonableness of the 4¢ royalty rate. See Rude v. Westcott, supra; 3 Walker on Patents (Deller's Ed.1937), § 823, p. 2158. Shuron maintains that the nine licenses were tainted by duress and hence are not probative of true market value.

Even if American actually represented to prospective licensees that it would sue them for infringement if they practiced the Gagnon invention without taking a license, such a representation is always implicit in negotiations for a patent license and does not constitute duress. And American's promise to some of the optical manufacturers that they would receive the benefit of any subsequent court reduction of the royalty was merely declaratory of its obligation under the uniform royalty provision of the consent judgment.

While there is nothing in the record to substantiate Shuron's charge of duress, the court is nevertheless of the opinion that under the circumstances the nine licenses do not establish a royalty for a license under the Gagnon patent. It is claimed that the nine licensees were in a stronger bargaining position than the ordinary applicant for a patent license by reason of the fact that under the consent judgment they could have compelled American to resort to the courts (as Shuron did) if they were dissatisfied with the terms offered them. However, those nine licensees did slightly less than 25 per cent. of the total volume of business in semi-rimless mountings. While it can not be assumed that each of the nine accounted for only 2.8 per cent. of such business, it may be inferred that a number of them had too small a financial stake in the matter to warrant the expense of litigating the reasonableness of the 4¢ royalty, especially when they had the right to cancel their licenses on 30 days' notice and were assured that any later reduction in the royalty rate would inure to their benefit. Moreover, the prospective licensees may have been at some disadvantage in conducting their negotiations with American because they were already using the patented invention in the manufacture and sale of semi-rimless mountings. The court, therefore, is not satisfied that those licenses,

in and of themselves, are sufficiently reliable to establish a royalty for a license under the Gagnon patent and to dispense with the necessity of further inquiry as to the reasonableness of the proposed royalty. As a matter of fact, both American and Shuron rely on the royalty history of the Gagnon patent before the entry of the consent judgment to support their respective contentions.

In 1932, American, as exclusive licensee of the Ful-Vue Sales Company. with the right to sublicense, granted Shuron and other optical manufacturers a license under the so-called Ful-Vue patents (hereinafter called the Ful-Vue license). These patents covered spectacle mountings in which the temple hinges were located substantially above the normal line of vision.

In August, 1938 American, as exclusive licensee of the Uhlemann Optical Company with the right to sublicense, licensed Shuron and others under the so-called Uhlemann patents relating to semi-rimless mountings, at a royalty of 2¢ for each mounting. Mountings covered by the Uhlemann patents and also embodying the Ful-Vue feature were to be known as "Numont Ful-Vues" (hereinafter referred to as Numont mountings). Simultaneously, American fixed 6¢ as a royalty rate for approved Numont mountings under the Ful-Vue license. Thus the overall royalty rate paid by licensees on Numont mountings was 8¢, 6¢ under the Ful-Vue license and 2¢ under the Uhlemann license.

Shortly after the appearance of the Numont mounting Shuron began to manufacture a new type of Ful-Vue semi-rimless mounting known as the "Sureset Ful-Vue Rimway" under the Ful-Vue license and a license granted by the Bay State Optical Company dated September 22, 1939 which included Nerney Patents No. 1,747,904 and No. 1,984,541. In October, 1940 American acquired these Nerney patents from Bay State and granted licenses thereunder to other optical manufacturers (hereinafter called the Rimway licenses). Because it was the first company to introduce the Rimway mounting Shuron had been given a preference by Bay State and paid a royalty of only 1.8¢ per unit under its

license from Bay State, whereas all other licensees paid 3¢. The total royalty generally paid by licensees on Rimway Ful-Vue mountings was 11¢, 8¢ under the Ful-Vue license and 3¢ under the Rimway license.

On November 23, 1939 an agreement, supplemental to the Ful-Vue license, was entered into between Shuron and American whereby the latter added the Gagnon patent, Emons Patent No. 2,041,638 (owned by the Ful-Vue Sales Company) and two Canadian patents to the original package of basic Ful-Vue patents. Although American was under no obligation to do so, it made these additions without increasing the existing Ful-Vue royalty. Similar agreements were consummated with the other Ful-Vue licensees.

On December 10, 1946, the date of the expiration of the last of the basic Ful-Vue patents, American announced to its licensees that their Ful-Vue licenses would "remain in effect" and that they would continue to have rights under the Emons patent, but that it had decided not to charge royalties or impose terms under that patent. Royalties under the Ful-Vue license (which included a Gagnon license) were to be payable only on semi-rimless mountings and were fixed at 4¢ per unit as of January 1, 1947. From that date until September 17, 1948, when the consent judgment was entered, licensees, including Shuron, paid American this 4¢ royalty under their Ful-Vue licenses both on Numont and on Rimway mountings. In addition, they continued to pay 2¢ on Numont mountings under the Uhlemann licenses and 3¢ (1.8¢ in the case of Shuron) on Rimway mountings under the Rimway licenses.

American contends that it is clear from this royalty history that the only patent under which the Ful-Vue royalty of 4¢ was charged from January 1, 1947 to September 17, 1948 was the Gagnon patent, thereby attributing no importance to the presence of the Emons and Canadian patents and certain trade-mark rights in the Ful-Vue package.

Despite American's express waiver of royalties under the Emons patent, its inclusion in the package can not be over-

looked. Admittedly, manufacturers of fully-rimmed Ful-Vue mountings who were licensed under Emons but not under Gagnon did not pay any Ful-Vue royalty at all after December 31, 1946. But it is not clear that manufacturers of semi-rimless Ful-Vue mountings who required a license under Gagnon could have refused to pay the 4¢ royalty and still have retained any rights at all under the Ful-Vue license, one of which was the right to practice the Emons invention. It is to be noted that American's royalty schedule of December 10, 1946 fixing the Ful-Vue semi-rimless royalty of 4¢ expressly provided that it was "an integral part of the Manufacturing Patent License Agreement" between American and its manufacturing licensees, that is, the original Ful-Vue license agreement as supplemented by the addition of the Gagnon, Emons and Canadian patents. Hence, semi-rimless manufacturers might have supposed that their 4¢ was also purchasing protection against a suit for infringing Emons. That such a suit was within the realm of possibility is borne out by American's agreement with the Ful-Vue Sales Company dated December 10, 1946, the same day that American notified the semi-rimless manufacturers of its intention to charge a 4¢ royalty under the Ful-Vue license. The agreement, which in settlement of a controversy over American's asserted right to cancel its exclusive license under the Emons patent required American to pay the Ful-Vue Sales Company 2¢ on each mounting manufactured and sold by American or its licensees under the Gagnon patent so long as American received royalties on that patent under existing licenses, expressly confirmed American's exclusive license under the Emons patent with the right to license others and to sue for infringement. This agreement was one of those cancelled by the consent judgment.

Though the record does not disclose the value of the Canadian patents, the court can not assume that they were worthless.

In addition, semi-rimless manufacturers obtained the right to use the registered trade-marks "Ful-Vue" and "Rimway" by virtue of their Ful-Vue licenses. "Ful-Vue" had been used by optical manufacturers for a number of years to designate articles manufactured under the original Ful-Vue patents. Conceding that when the last of those patents expired in December, 1946 it was doubtful that former licensees under the patents could have been prevented from continuing to use "Ful-Vue" as a trademark, (see Kellogg Co. v. National Biscuit Co., 305 U.S. 111, 117–118, 59 S.Ct. 109, 83 L.Ed. 73), optical manufacturers did not have any absolute assurance that interference would not be attempted if they cancelled their Ful-Vue licenses. The possibility of interference was only foreclosed by the consent judgment enjoining the owner of the mark from interfering with any non-deceptive use thereof. As for the trade-mark "Rimway", American contends that Shuron used its own trade-mark "Shurset" to describe mountings of the Rimway type. The fact of the matter is that Shuron's designation for such mountings was "Shurset Ful-Vue Rimway". Moreover, it does not appear that any of the other manufacturers of Rimway mountings used "Shurset" in conjunction with the Rimway designation. It can not reasonably be supposed that the "Ful-Vue" and "Rimway" trade-marks were totally devoid of value to the licensees who used them and that their inclusion in the Ful-Vue package did not provide any inducement to pay a royalty of 4¢.

The royalty history of the Gagnon patent from late 1939, when it was originally added to the Ful-Vue package, to December 31, 1946, shortly after the expiration of the basic Ful-Vue patents, also lends some support to Shuron's position in this proceeding. During that entire seven-year period American extended to all its semi-rimless Ful-Vue licensees free licenses under the Gagnon patent. American suggests that the semi-rimless mounting was an untried innovation in 1939 and hence that the time was not propitious to increase the overall Ful-Vue royalty rate. Assuming this to be so, no reason has been advanced why American continued its royalty-free licensing policy long after the semi-rimless mounting had become a commercial success. Though the sales figures have not been made available, it has been stipulated that

"(f)rom 1938, when the first semi-rimless mounting was introduced, sales of such mountings increased steadily through 1946" and that "(s)ince 1946 sales of such mountings have declined."

Shuron argues at great length that properly construed the Gagnon patent covers only the Numont and not the Shurset Rimway mounting, and as such is practically worthless; further, that if American's broader construction be accepted, Gagnon is anticipated by the prior art, particularly Nerney. Whether Shurset Rimway infringes Gagnon can be determined ·in an appropriate proceeding. It need not be, and is not, determined here. For present purposes it suffices to observe that credit for the commercial success of semi-rimless spectacles does not belong to Gagnon alone. The popularity of the Numont mounting is at least partially attributable to the Uhlemann design patent, and it is abundantly clear that the success of the Rimway construction is in no small measure due to the inventiveness of Nerney, who preceded Gagnon. At the same time, Gagnon's contribution to the art, even if it be limited, as urged by Shuron, to the "formation of a rearwardly curved arm ending in an integral temple hinge as an integral continuation of the brow arm of a semi-rimless spectacle" (in short, the Numont mounting), can not be dismissed as "trivial" or the "shadow of a shade".

In the last analysis, however, the most reliable indication of the reasonable value of a license under the Gagnon patent is furnished by its royalty history. For seven years American licensed the patent without exacting any royalty, despite the fact that over that period semi-rimless mountings came to enjoy increasing commercial success. Thereafter, American charged its semi-rimless licensees 4¢ for a package which, in addition to the Gagnon patent, included the Emons and Canadian patents and the right to use the trade-marks "Ful-

Vue" and "Rimway". Finally, after the consent judgment wiped the slate clean, nine optical companies agreed to pay a 4¢ royalty.

Bearing in mind that under the consent judgment the burden of proof is on American in this proceeding, the court is not satisfied that 4¢ is a reasonable royalty solely for a license under the Gagnon patent. .Licensees never paid such a price prior to the consent judgment, and it would seem manifestly unfair to require them to pay it now,[1] especially when the sales of semi-rimless mountings appear to be on the wane. Fixing a reasonable royalty where an established royalty does not prevail presents many difficulties. See U. S. v. National Lead Co., 332 U.S. 319, 349–350. The best estimate of the court under the circumstances is that 3 cents is a reasonable royalty for optical manufacturers to pay for a license under the Gagnon patent.

Judgment should be entered accordingly.

---

1. In January, 1947 the prevailing selling price to wholesale distributors of Numont and Rimway mountings was approximately $2.65 per unit. The present price at which American sells these mountings to wholesalers is $2.85, or an increase of about 7½ per cent. over the 1947 price. A proportionate increase in a 4¢ royalty rate would yield a royalty of 4.3¢, an insignificant change in a royalty based on the selling price.